UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DARREN CARLYLE SADLER | No. 25 CR 132<br><br>Judge Thomas M. Durkin |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, respectfully states the following as the Government's Sentencing Memorandum concerning defendant Darren Caryle Sadler.

Pursuant to United States Sentencing Guidelines § 5K1.1, the Government respectfully urges the Court to sentence defendant Darren Caryle Sadler to a term of imprisonment below the applicable advisory sentencing guidelines range. Taking into account defendant's early and full acceptance of responsibility for his Payroll Protection Program fraud scheme, as well as his substantial cooperation in this matter, the Government requests a sentence of 50 months' imprisonment. This term represents "a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

## I. The Presentence Investigation Report is Factually Correct and Properly Calculates the Applicable Advisory Sentencing Guidelines.

The Government agrees with the facts provided in the Presentence Investigation Report. *See* PSR, ¶¶7-14. During his scheme, defendant Sadler engaged in two types of PPP fraud: fraud in which Sadler procured PPP loans for small business owners after submitting false documents and information without their knowledge and input; and  fraudulent PPP loans for his own businesses. Ultimately, Sadler benefitted through the fraud scheme, which enabled him to obtain

over $14M in loans from the PPP for over 63 applicants, and acquire brokers fees for the loans and loan proceeds for the three loans he orchestrated for himself.

The Government agrees with the criminal-history and offense-level calculations set forth in the PSR. Defendant falls at Level 31, before receiving acceptance of responsibility. He is also in Criminal History Category II.

Consequently, before any reduction for his cooperation, at Level 28 and Category II, defendant faces a possible advisory Guidelines sentence of 87 to 108 months' imprisonment. PSR, ¶¶32, 87.

## II. Because Defendant Cooperated, He Should Receive a Sentence Below the Advisory Guidelines Range.

Because of the serious nature of the underlying offense conduct, as well as other aggravating factors specified below, defendant's potential sentencing exposure in this case is otherwise significant and substantial. Indeed, before factoring in whether a reduction for his cooperation applies, the Section 3553(a) factors support a sentence within the applicable advisory Guidelines range, and that range is high, especially for someone who admits to defrauding a federal program of more than $14M. However, as discussed below, defendant cooperated substantially from the onset of the investigation, though his cooperation did not yield charges against others. For these reasons, while defendant would otherwise be deserving of the significant term of imprisonment that flows from the applicable advisory Sentencing Guidelines range (87 to 108 months), defendant's cooperation was early and substantial in this matter. He should therefore receive a reduction from his advisory Guidelines sentencing range.

### A. The Nature, the Circumstances, and the Seriousness of the Offense Conduct

It is uncontroverted that defendant's offense conduct was serious and borne of greed. To enrich himself, defendant engaged in an extremely large, complex scheme that defrauded an

important pandemic financial assistance program during a time of great uncertainty, the initial months of the COVID-19 pandemic.

Prior to the pandemic, Sadler owned loan brokering businesses through which he assisted small business owners in obtaining lines of credit and loans by acting as a middleperson between the business owners and lending institutions in return for a fee. Sadler would typically collect the business owners' information and then sought the best loan options for his business owner clients.

In March 2020, Sadler resided in San Diego, California. After the enactment of the CARES Act, Sadler began contacting his existing and former clients and offered to assist them in obtaining PPP loans. He conferred with an accountant and bookkeeper residing in San Diego (Co-Schemer A), whose services he had utilized in the past, about the types of information and documents that would be needed in order to submit applications and obtain PPP loans for his clients. Sadler and Co-Schemer A discussed program requirements and devised a list of the required information and documents to request from any clients interested in obtaining PPP loans.

Existing and potential clients contacted Sader about applying for PPP loans. At times, Sadler also used recruiters who would refer additional clients to him in exchange for a fee, including Co-Schemer B. As requested, these existing and potential clients provided Sadler with the various pieces of information and documents about their businesses which banks and loan institutions would require for loans, including the information and documents set forth in the list that he prepared with the help of Co-Schemer A.

After receiving this information and these documents, Sadler determined that several clients either did not legitimately qualify for PPP loans or did not qualify for a loan in an amount large enough to justify the fee that he wanted to get for his brokering services. Sadler and Co-Schemer A then discussed and decided to falsify the information and the supporting documents

submitted on behalf of these clients in order to make it appear that the clients employed more individuals than they actually employed and had larger corresponding payrolls than they actually did at their businesses.

Sadler knew that the amount of a PPP loan was based upon the average monthly payroll for a business and that there were limitations on the amount of income that would be considered for each employee. Sadler therefore decided purposefully to include false information that artificially inflated the number of employees and the resulting payroll for his clients' businesses in order to obtain PPP loans in amounts larger than his clients were entitled to otherwise receive, if at all, for their businesses. With the help of Co-Schemer A, Sadler then submitted these false applications on behalf of the clients by, among other things, preparing fake documents to support the false information about employees and payroll contained in the applications. It is undisputed that the number of employees and the payroll figures were material to the lenders in approving and funding PPP loans.

Thereafter, in or about April and May of 2020, with Co-Schemer A and others who referred potential clients to him, Sadler then caused the creation and submission of more than sixty PPP loan applications for his business owner clients, all of which contained false information regarding the number of their employees and average monthly payroll. Sadler purposefully inflated the number of employees, if any, working for these business as well as the amounts of payroll in these applications in order to fraudulently increase the amount of the PPP loans for his clients. Sadler also caused the submission of false documents, including false payroll documents and tax forms, in connection with these PPP loan applications. Recruiters, including Co-Schemer B, received a portion of the loans proceeds as a fee, though Sadler ended up with a profit of nearly $2M for his fraud scheme.

To facilitate the submission of these applications, Sadler utilized automated processes, such an application portal, and contractors to help him obtain information from potential clients as well as to submit the PPP loan applications along with the false documents.

In order to conceal the scheme, Sadler caused the PPP loan applications to be submitted in the names of his clients as if they were personally applying for the PPP loans. Sadler caused the applications to be submitted utilizing virtual private networks located in the same area as his clients in the event that the lender captured IP address information during the application process. Sadler also created and used unique email addresses, which often included the name of the client's business, to apply for the PPP loans and to communicate with the lenders as needed. This procedure allowed Sadler to control all communications with the lenders and to conceal his scheme from others, including the business owners, who were not aware of the actual paperwork that was submitted by Sadler.

For example, one of the false applications that Sadler caused to be submitted was an application that Sadler sent on behalf of Business Owner A, who owned a trucking business located in Matteson, Illinois, and wanted the PPP loan proceeds deposited into an account held at a bank in Elk Grove Village, Illinois. In April 2020, Sadler prepared and submitted a PPP application for Business Owner A that contained materially false representations about the number of employees and monthly payroll for Business Owner A's trucking business. Business Owner A's loan application was approved in April 2020, based on the loan application containing materially false representations that Sadler prepared and submitted, and in early May 2020, a bank funded a PPP loan in the amount of approximately $268,100 for Business Owner A by wiring funds into Business Owner A's bank account. This was but one of over 60 interstate wires that fraudulently

resulted in PPP funds being deposited into accounts based on the submission of false and fraudulent documentation that Sadler provided lenders, using the above-described process.

In addition to submitting false applications on behalf of clients, Sadler also submitted and obtained three fraudulent PPP loans for his own businesses: Milan Equity Group, LLC; Milan Financial, LLC; and BCOA Centers, LLC. In order to obtain these loans, Sadler submitted loan applications that falsely inflated the number of employees and payroll for each of his businesses. Sadler also submitted false tax forms and payroll summaries to support these fraudulent applications.

In reality, none of these businesses had any actual employees. Sadler falsely represented the number of purported employees and the average monthly payroll for these businesses in order to receive PPP loans in loan amounts in excess of any amount he otherwise would have been entitled to receive under the program. Put simply, Sadler also took advantage of the loan situation during the early days of the pandemic to not only get broker's fees from the PPP loans that he orchestrated for many business owners, but to also enrich himself through the receipt of three personal PPP loans that were similarly fraudulent.

Based upon these false representations and supporting documents, Sadler caused financial institutions to fund PPP loans to his businesses in the amounts of $457,612 to Milan Financial, LLC; $380,000 to BCOA Centers, LLC; and $453,600 to Milan Equity Group, LLC. Sadler caused the proceeds of these loans, which exceeded $1M, to be deposited into accounts personally controlled by him.

After receiving the proceeds of these loans and the broker's fees he received from loans that he obtained for more than 60 clients, Sadler went on a massive spending spree. He used the proceeds of his own PPP loans for his own personal gain, not legitimate business expenditures

associated with the three business entities that he claimed to operate. The loan proceeds and the funds that he received from client fees resulted in a princely lifestyle for a period of almost one year during the pandemic. Among other things, Sadler used the ill-gotten profits of his scheme to rent a villa for several months during the pandemic. He traveled across the country on private jets to meet clients and appear in person at bank branches to secure fund transfers. He purchased luxury vehicles, including a Rolls Royce coupe, a Mercedes Benz SUV, a Mercedes Benz convertible, and a Land Rover. He also bought luxury goods, including designer clothing and a luxury watch, and ought numerous meals at expensive restaurants that included an entourage, not just himself.

In total, Sadler's offense resulted in at least 63 fraudulent PPP loan applications, which yielded over $14 million in loan funds that generated almost $2M in fees that he received. Also within the loss he caused is the $1M in loans that he personally received.

Again, the conduct in which Sadler engaged was very serious, and it resulted in a massive loss to the PPP during a time when the country's economic system was at risk. Rather than actually promote businesses, as the PPP was intended to do, Sadler caused the system to incur a loss from loans that he did not repay and which others did not receive based on accurate information. The significant restitution amount that Sadler has agreed to pay, $14,692,762, signifies the breadth, scope, and complexity of his crime.

This is not, as Sadler requests, a case that should result in a non-custodial sentence. A term of imprisonment is required.

**B. The History and Characteristics of the Defendant**

Sadler must certainly be punished appropriately, like all others who defraud government programs in a similarly complex and wide-ranging manner. He exhibited greed and clearly lost sight of a moral compass in order to gain financially during the pandemic, when he quickly realized

that he could tap into government programs and expeditiously receive funds intended for other purposes.

However, as explained above, Sadler quickly cooperated when his scheme was uncovered. Indeed, less than one year after the pandemic scheme began, law enforcement identified some of the loan recipients who lived in this District. When agent went to one business owner's home, the owner was surprised to learn that the documents that had been provided by Sadler in support of the business owner's loans were, in fact, fraudulent and not documents that he had given Sadler. Investigators then recognized that other loan recipients, whom this business owner had referred to Sadler, had similarly received pandemic loans based on fraudulent documents that the loan recipients were not aware of. All of the business owners had gotten loans that Sadler had orchestrated, but none knew that Sadler had created email addresses that they had no access to, nor that Sadler had been communicating with the lenders without their knowledge or input. Fraudulent documents in support of the loans were submitted by Sadler without the applicant's knowledge, and Sadler thereby gained significant fees as the loan proceeds were disseminated.

As defendant notes, after investigators froze the account into which most of the loan proceeds were initially deposited, and identified that Sadler had taken sizeable broker's fees, Sadler retained counsel. He began to cooperate immediately. He sat for several extensive proffers in different locations and also assisted law enforcement in identifying clients for whom he obtained loans using fraudulent means, as well as the co-schemer who helped him determine what documents need to be submitted and how to fabricate them, and the co-schemer who recruited some loan recipients. Sadler turned over emails, identified phone calls, and also explained at length the process by which he and co-schemers conceived the scheme and then orchestrated the disbursement of almost $15M from the PPP. His conduct was otherwise substantial. *See* Sealed

Document. Sadler also cooperated in the forfeiture of over $1.8 million in fraudulent proceeds by entering into a stipulation concerning proceeds located in the above-identified bank account. He also assisted in the identification and recovery of automobiles purchased with fraud proceeds.

In the Government's view, Sadler's cooperation was substantial and worthy of a downward variance pursuant to § 5K1.1 and the terms of his cooperation plea agreement. Such a downward variance will also account for the mitigating information cited in defendant's sentencing memorandum.

### C. Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, and Deterrence

When a pandemic struck the country and created substantial difficulties for the economy, defendant elected to be greedy and earn money fraudulently, capitalizing on the extremely tumultuous period facing Americans. In pursuing wire fraud, defendant negatively impacted pandemic loan programs, which obviously hurt the U.S. economy and reduced the availability of funds for other social programs. Given the seriousness of the conduct and the negative impact on the pandemic loan program, the Government views defendant's crimes as extremely serious and worthy of substantial punishment. A term of incarceration is certainly appropriate for defendant's conduct. A sentence of imprisonment will also address the other applicable Section 3553(a) factors, such as the need for the sentence imposed to promote respect for the law, provide just punishment, and to deter others, as well as defendant, from engaging in fraud scheme like that Sadler committed.

### D. Defendant Should Receive a Downward Variance for Substantial Cooperation.

There is no question that a term of incarceration is appropriate for these offenses. However, the punishment to be meted must, of course, factor in the above-described mitigating information

that relates to Sadler's cooperation and be balanced against the hardships of a sentence that falls with the applicable Guidelines range. Therefore, pursuant to the cooperation provision in defendant's plea agreement, and pursuant to U.S.S.G. § 5K1.1, Sadler should receive a downward variance for his substantial cooperation.

The Government respectfully urges the Court to sentenced Sadler to a term of 50 months' imprisonment, which rewards him for his cooperation and acknowledges the mitigation cited in his sentencing memorandum, but also will enable him to begin repaying the restitution that is owed from his conviction once he completes his term of imprisonment.

## III. Government's Position on Supervised Release

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the Government recommends the imposition of a term of supervised release of three years. The Government recommends that this term of supervised release include the conditions set forth in the PSR. PSR, ¶90.

## IV. Conclusion

A non-custodial sentence is simply not appropriate for this defendant and his defenses, which are extremely serious and wide-ranging. For the foregoing reasons, the Government requests that the Court sentence defendant Darren Carlyle Sadler to a term of imprisonment of 50 months' imprisonment, to be followed by three years of supervised release. Defendant should also be ordered to make restitution in the amount of $14,692,762.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: /s/ *Kartik K. Raman*

KARTIK K. RAMAN
Assistant U.S. Attorney
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 469-6026
*kartik.k.raman@usdoj.gov*

Dated: September 25, 2026